SIMPSON L. FORD, RECEIVER, v. ISAAC P. LAMSON ET AL.

L. PHILILLI v. AMMON-STEVENS CO.

1. PAYMENT OF SUBSCRIPTIONS TO CAPITAL STOCK.
  Where, prior to the organization of a corporation, the persons afterwards composing such corporation had been prosecuting the business under a partnership agreement until the terms of such agreement expired, at which time they incorporated themselves, and the subscription to the capital stock of such corporation was paid by the transfer of all the partnership assets to such corporation and such corporation assumed all the liabilities of the partnership; it being shown that the partnership was insolvent at that time, and that in the transfer made, there was nothing actually transferred to the corporation. *Held*, that nothing whatever that should be counted as a payment of the stock subscriptions was transferred by the partnership to the corporation, and, therefore, the subscribers to such stock are still liable to pay, for the bene fit of the creditors to the receiver of the corporation, their subscriptions to the stock made, the same to be distributed to the creditors of the corporation *pro rata.*

2. WHEN CREDITOR OF AN INSOLVENT CORPORATION IS ENTITLED TO ENFORCE HIS CLAIM.
  Where a creditor of a corporation, while such corporation was in possession of its property and apparently so far as known to outsiders was engaged in the prosecution of its business, advanced to and for such corporation at the time he received the latters note, the full sum for which he took such note, such transaction is not illegal, and such creditor holds his note by good title, and he may lawfully enforce his claim against the corporation by any remedy provided by law.

3. DIRECTORS OF AN INSOLVENT CORPORATION ARE TRUSTEES OF THE CREDITORS OF THE CORPORATION.
  The directors of a corporation are trustees for the stockholders, and, therefore when the corporation becomes insolvent and the stockholders have no longer a substantial interest in the property of the corporation, the directors should be regarded as trustees of the creditors to whom the property of the corporation must go, and they cannot violate that trust by transferring the assets of the corporation to themselves or to relieve themselves from collateral liability.

4. AN INSOLVENT CORPORATION CANNOT SECURE ITS DIRECTORS ON DEBTS UPON WHICH THEY ARE COLLATERALLY LIABLE.
  An insolvent corporation with no expectation of continuing its business cannot rightfully secure or pay debts to its directors nor debts upon which such directors are collaterally liable, and thus relieve such director from his collateral liability.

Ford, v. Lamson et al.

6. RIGHT OF ATTACHING CREDITOR AS AGAINST THE GENERAL CREDITORS OF AN INSOLVENT CORPORATION.

> Where a creditor of a corporation commences an attachment proceeding and levies upon the book accounts of such corporation, and such levy is made before a receiver is appointed to take charge of such corporation, such attaching creditor obtains a lien and a preference by virtue of his attachment.

HALE, J.

These cases are here on appeal. They have been tried together, involving substantially the same transaction and submitted. I will endeavor to indicate sufficiently to enable counsel to draw the decree.

The controversy arises between the unsecured creditors of The Ammon-Stevens Co., an insolvent corporation, and certain creditors who are claiming preference.

On January 1, 1893, the Ammon-Stevens Co., was incorporated with a capital stock of $40,000 to prosecute a wholesale millinary business in the city of Cleveland. Of this stock F. C. Ammon subscribed $20,000; A. J. Stevens, $10,000; I. P. Lamson, $9,800; N. S. Calhoun, $100, and Mr. Jennings, $100—the latter two being given one share each in order to qualify as directors of the company.

The first issue made arises out of the claim made by creditors averring that the several subscriptions to the capital stock have not been paid, that the same is still due and should now be paid to the receiver to be distributed to the creditors of the corporation pro rata.

Prior to the organization of this corporation the first three subscribers had been prosecuting the business under a partnership agreement from January 1, 1890, to December 1, 1892, when, by its terms the partnership agreement expired.

The subscription to the stock was attempted to be paid by the transfer of all the partnership assets to the corporation, the corporation assuming all the liabilities of the partnership and the claim is that the partnership was insolvent at that time, and, in the transfer made, actually transferred nothing to the corporation.

And we find and hold that the partnership at the time of this transfer was insolvent even after the cancellation of an indebtedness of the $26,000 due from the partnership to Mr. Lamson.

Soon after the formation of the partnership, $10,000 of the accounts was charged off and, although the corporation did business for a period of nearly eighteen months, at the end of that time $33,000 of the accounts transferred to make up the $40,000 of the assets that was claimed to exist and transferred to the corporation in payment of the stock, were yet uncollected and nothing has ever been realized from them. The partnership had been doing business for three years, and necessarily there must have been a considerable depreciation of the tangible property then on hand by the partnership.

And we hold that nothing whatever that should be counted as a payment of the stock subscriptions, was transferred by the partnership to the corporation.

Sometime in January or February, 1894, Mr. Lamson sold to Mr. Ammon who was at that time insolvent, $5,000 of his stock—sold it as paid-up stock, and we do not think as against creditors that that should release him of his liability to pay his subscription; so that the subscribers to that stock are still liable to pay, for the benefit of the creditors to the receives, the subscriptions to the stock made.

The corporation continued to prosecute its business for which it was incorporated until June 2, 1894, at which date its liabilities exceeded the value of its assets by more than $50,000 and at least $100,000 more than can be realized from the assets in the manner in which the concern is being closed out.

The acts of the board of directors on that date prior and subsequent thereto are made the basis of several claims by the plaintiffs and cross-petitioners.

The evidence establishes the following facts:

That the business of the corporation was carried on at a loss from the start, of which the directors had knowledge; that very large purchases were made for the spring trade of 1894; that prior to April 14, 1894, the business had been conducted under the chief management of Mr. Ammon. At that last named date the board of directors resolved that checks should be issued for the payment of bills owing by the corporation, only on the approval of Mr. Calhoun, one of the directors, after which a large proportion of the receipts were paid on claim upon which Mr. Lamson was surety or in some way responsible. On this date the corporation was indebted to The Bristol National Bank of Connecticut and the Hartford Bank, in the aggregate $31,000, upon which Mr. Lamson was surety.

The corporation was also indebted to The Union National Bank of this city in the sum of $32,000 for which Mr. Lamson was surety, and to Caskey & Calhoun in the sum of $13,000 upon which Mr. Lamson was not an indorser. On June 2, 1894, the corporation, by its trustees, resolved to transfer accounts of the face value of $55,000 to Mr. Lamson for the sum of $45,000 for the express purpose of paying the Union National Bank and Caskey & Calhoun. Mr. Lamson had just returned from Connecticut where he had arranged with Mr. Sessions, his brother-in-law, to take up the claims of the Connecticut Banks and advance $1,000 to the corporation, for which he was to receive a cognovit note of the corporation due on demand. Whether the latter part of that agreement was definitely arranged between Sessions and Lamson does not definitely appear, but ultimately it took that form. The debts to the Connecticut banks were not due at the time payment was made to the banks. The note with power-of-attorney to confess judgment was authorized by the directors at this meeting was executed, and forwarded by Mr. Sessions. The arrangements authorized by this resolution were carried out; the accounts were transferred to Lamson, $45,000 paid by him; $32,000 was paid to The Union National Bank, and $13,000 to Caskey & Calhoun and these debts were cancelled.

The cognovit note was sent to Mr. Sessions who paid the two banks in Connecticut; he also sent to the corporation, The Ammon-Stevens Company, $1,000; this note was not endorsed by Mr. Lamson, it was made on the second of June, immediately forwarded to Mr. Sessions, received by him on the fourth of June, and on the same day sent to Mr. Bourne, cashier of The Union National Bank of this city for collection.

In this way Mr. Lamson was relieved from his endorsement or liability on $63,000 of the companies paper, and substantially all the good accounts withdrawn from the assets of the corporation and from the reach of unsecured creditors. On June 13, judgment was entered up upon this note in the court of common pleas of Lake county, with the knowledge of at least one of the directors of the corporation; execution was issued upon that judgment, and on June 14th, levy was made upon all

tangible property of the corporation which ended any further prosecution of the business by the corporation.

About the time the accounts were transferred to Lamson, the company, by its directors—not we think, in the usual course of business, sold merchandise to O. D. Myers and Taylor Sons & Co., of this city, aggregating about $7,000 which was likewise used to pay debts secured by Mr. Lamson.

It is not disputed that at the time of the transaction above indicated, the liabilities of the company exceeded largely the value of the assets; that the corporation was, in fact, insolvent.

It seems equally clear to us that the directors, at the time these acts were done, knew or should have known that the corporation was grossly insolvent.

We are of the opinion also that the action taken by the directors of this insolvent corporation practically incapacitated it from further prosecution of its business with any reasonable prospect of success, and this, too, we think the directors ought to have known. We do not think or believe that the directors who testified that they hoped to bring the company out of its trouble and yet make it a success, had any such expectation; but we can only say that there was no reasonable basis for such hope. The corporation had been kept afloat by the aid of Mr. Lamson in making advances to the company and in endorsing its paper. When this support was withdrawn, there was no alternative, but failure. The adoption of the resolution of June 2d, and the carrying out of the transactions therein provided for, put the affairs of the corporation in such condition, that there was practically no alternative, but failure.

By these essential facts of the case, the rights of the parties are to be determined. First, it is claimed by the receiver, that the money paid to The Union National Bank should be refunded to him that it may be distributed to the general creditors of the corporation pro rata. Upon this claim we hold with the bank.

The evidence shows no collusion between the bank and directors of the corporation. It is not shown that the bank had knowledge of the situation. The company at the time this payment was made to the bank was in the actual possession of its property and engaged, in a way, in the prosecution of its business, nor do we think the affairs of the corporation had reached a condition when the doctrine of the case of Rouse, Trustee, v. Merchants' Nat'l Bank, 46 O. S., 493, applies.

Again, it is sought to have declared void the levy of the execution issued on the Session's judgment. The evidence in the case does not authorize the finding that Mr. Sessions knew of the condition of the corporation, or colluded with or aided the directors in defrauding the general creditors of the corporation or in carrying out a purpose by the directors to prefer themselves.

If we are right in our holding as to the bank, Mr. Sessions can not be deprived of his advantage, by the doctrine of the Rouse case, *supra*.

Sessions actually advanced to and for the corporation at the time he received the note, the full sum for which he took the company's note. The transaction was not illegal, and he held his note by good title. While the company was in possession of its property and apparently so far as known to outsiders, was engaged in the prosecution of its business, we are of the opinion that a creditor might lawfully enforce his claim against the company by any remedy provided by law. We, therefore, decide this issue in favor of Mr. Sessions, not without some doubts

and misgivings.   Much might be said against this holding—the fact that the claim was not due; that Mr. Sessions was a brother-in-law of Mr. Lamson's, and other circumstances, connected with it, tend quite strongly to show that there might have been some collusion between Lamson and Sessions to bring about the result that was accomplished, but we hold as I have stated.

Again, what are the rights and liabilities of Mr. Lamson?

We have found that the corporation at the time of the transfer of the accounts to him—to Mr. Lamson—was insolvent, of which fact he (Lamson) had knowledge; that the board of directors could have had no reasonable expectation of continuing for any considerable time the business of the corporation; that after the acts of June 2d and those immediately following, the only alternative was failure which was then eminent.

We must find also under the evidence, that one of the objects of the board was to relieve Mr. Lamson from his liability, and, if we are to hold the board to have intended the natural legitimate results of the acts done, that it was the intention of the directors to prefer him and relieve him from his liability as surety.

The authorities are not entirely uniform upon the subject of preference of an insolvent corporation of its directors.

In Connecticut and two or three other states the courts have sustained preference to directors under circumstances similar to those found in this case; but the decided weight of the authority is against the proposition.   As indiciating the general tendency of the authorities I read a sentence or two from the case of Alney v. The Connecticut Land Co., 16 R. I., 597.

"The directors of an insolvent corporation are by virtue of their position, debarred from preferring debts of the corporation due to themselves.

"The directors of a corporation are trustees for its stockholders. When the corporation becomes insolvent, the directors become trustees for the corporation creditors."

In the discussion of the case the reasons are briefly given for this holding.   "The vital question is, whether a director of an insolvent corporation is to be regarded as a trustee for its creditor.   If he is so, the duty of a trustee to a *cestui que trust* is plain.   For a trustee to collect his own debts, to the detriment of that of his *cestui*, is a clear breach of fidelity.   When one accepts the trust of caring for another's interest he accepts the attendant duty.   It must be admitted that directors of a corporation are not technical trustees.   They do not have in themselves the title to property which they hold for the benefit of others; and certainly, as to creditors, they are under no express trust.   The corporation is a legal being, distinct from its officers and stockholders.   It may deal with them as individuals and may owe them debts.   It holds its own property, and has the capacity and responsibility of acting for itself. Nevertheless, the conduct of its affairs must, of necessity, be entrusted to officers in whom confidence is reposed, to whom large powers are given, and by whom its property is managed for the common benefit. As corporations have multiplied and have become so greatly concerned in business affairs in recent years, the obligations arising from such a relation have become correspondingly prominent."

While the decisions in regard to this relation are not harmonious, it has been generally agreed that directors are trustees for stockholders. This being established, we think it follows naturally that, when the

corporation becomes insolvent and the stockholders have no longer a substantial interest in the property of the corporation, directors should be regarded as trustees of the creditors to whom the property of the corporation must go.

Now, in this state, of course, the trust doctrine is carried to its furtherest extent and goes quite as far as it is carried in any other state.

We hold, then that an insolvent corporation with no expectation of continuing its business, can not rightfully secure or pay debts to its directors nor debts upon which such directors are collaterally liable, and thus relieve such director from his collateral liability. These accounts were not sold to Mr. Lamson in the usual course of business. He took the accounts under the stipulation that the money paid by him should be applied in payment, or a large proportion of it, upon debts which he was collaterally liable. He was under obligation before this transaction, to pay the debts which were actually paid, and the transaction is not different than it would have been, had he paid the debts and withdrawn from the corporation assets, accounts sufficient to indemnify himself for the payment thus made.

In this state at least, directors occupy a position of trust towards the creditors of an insolvent corporation, and can not, under the circumstances of this case, violate that trust by transferring the assets of the corporation to themselves, either in payments of debts due to themselves or to relieve themselves from collateral liability. The relation which directors bear to the corporation as trustees of its assets, is such that they can not rightfully prefer debts due to themselves from the corporation, or prefer debts in the payment of which they have a personal interest. The rule forbids, not only preference by directors of their own debts, but also all debts in which they are interested and from which they could reap a personal advantage by the preference. It follows, then, that the accounts were wrongfully transferred to Mr. Lamson and that he must account to the receiver for the proceeds realized by them, and that the money now held by the bank should be paid over to the receiver to be distributed *pro rata* among the creditors.

As to Caskey & Calhoun, the logic of what we have said would require either that they refund the $13,000 received, or require Mr. Lamson to account for the entire accounts transferred to him. And, as we hold, the withdrawal of the accounts from the assets of the corporation was wrongfully done with the knowledge of Mr. Lamson and Mr. Calhoun that those accounts—those assets, may be accounted for entirely by Mr. Lamson, and the controversy between him and Caskey & Calhoun settled between them. If the general creditors—the unsecured creditors get advantage of all the assets which the corporation had, they get all they are entitled to and they get that by having the benefit of all those accounts.

Now disconnected with this transaction is the claim of Menke against this corporation. He commenced an attachment proceeding and levied upon the book accounts of the corporation. The levy of this attachment was made on June 13th. On June 14th a receiver was appointed, of this corporation, Mr. Ford, in the second case that I named. The question here arises between this attaching creditor and the general creditors. He claims a preference by virtue of his attachment, and it is insisted by the receiver that he gets no such preference.

The majority of the court hold that by the levy of the attachment on June 13th on the book accounts, the attaching creditor obtained a

lien; that the provisions of the statute relating to the appointment of a receiver to collect those accounts and apply them to the debt of the attaching creditor are provisions of the statute enacted for the purpose of enabling the attaching creditor to realize the benefits of the attachment; and, in as much as a receiver was appointed on the day following the levy of this attachment, who was ordered to take possession of all the books, accounts and property of the insolvent corporation, that it would have been a useless thing to appoint a receiver at the instance of the attaching creditor to work out his rights under a levy; that all of that could properly be done under the receiver that was appointed for the benefit of the general creditors.

There is one of my associates, Judge Caldwell, who is very sure that we are wrong in this proposition, and very likely we are, but that is what we hold.

Mr. Caskey: · You have not passed upon the major point—upon the value of the property levied on the cognovit note, and the liability. You said Sessions was not chargeable, but you did not say saything as to Lamson.

Judge Hale: There, again, two of us, a majority of the court, do not think that Mr. Lamson ought to be held upon that levy; in other words, we allow Mr. Sessions the benefit of his levy, and do not require Mr. Lamson to make good to his creditors the amount of property withdrawn by that levy.

Judge Marvin: I can not understand how Mr. Lamson is to be excused from liability therein.

*Gilbert & Hills*, for plaintiffs.

*Caskey & Calhoun* and *A. A. Stearns*, for defendants.

---

# DISBARMENT OF ATTORNEY.

[Cuyahoga Circuit Court, February 13, 1899.]

Caldwell, Hale and Laubie, JJ.

(Judge Laubie of the Seventh Circuit, sitting in place of Judge Marvin.)